Rel: November 8, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2023-0832

_____

## Younes Essouiri

## v.

## State of Alabama

## Appeal from Jefferson Circuit Court
### (CC-19-1562)

McCOOL, Judge.

Younes Essouiri appeals his convictions for first-degree domestic violence (first-degree aggravated stalking), see § 13A-6-130, Ala. Code 1975; and second-degree domestic violence (third-degree burglary), see § 13A-6-131, Ala. Code 1975. The trial court sentenced Essouiri to 20

years' imprisonment for his first-degree domestic-violence conviction and split the sentence, ordering him to serve 3 years' imprisonment to be followed by 3 years of probation. The trial court sentenced Essouiri to 10 years' imprisonment for his second-degree domestic-violence conviction and also split that sentence, ordering him to serve 2 years' imprisonment to be followed by 3 years of probation.

Facts and Procedural History

The State's evidence at trial tended to establish the following facts. Essouiri and Andrea Rhea Williams married in August 2016 and later had one son. Williams already had one son when she married Essouiri, but it does not appear that the older son is Essouiri's child. Essouiri and Williams's marriage was "rocky" (R. 226) because Essouiri accused Williams of adultery and "began drinking heavily" (R. 228), and Williams had to contact the police "on numerous occasions" as a result of Essouiri's behavior. (Id.) The State also introduced multiple text messages Essouiri and Williams had exchanged, and some of the messages from Essouiri were threatening. Specifically, on October 26, 2017, Essouiri texted Williams while she was at work and told her that he was "going to fuck [her] up" because she was a "cheater" who was "addicted to men."

2

(C. 172.) Williams's reply text indicated that she was "terrified" (C. 173), and, when asked at trial why she had been terrified, Williams testified: "Because I didn't know what he was going to do to me." (R. 243.) Williams also testified as to what occurred when she arrived home from work on the evening of October 26:

> "When I went home that day, [Essouiri] was highly intoxicated. And I went to pack a diaper bag for my baby and my older child who -- the baby had spent the night before at my parents' house because of [Essouiri's] intoxication. And I got those packed, and I was going to leave.
>
> "I had the diaper bag, purse, phone, and he told me I was not going to leave, and he grabbed me by the throat and pushed me down to the floor. He held me on the floor by my throat. He was trying to get my phone away from me.
>
> "I fought with him. I tried to get him off of me. At that time he took my baby's diaper bag and my purse. When he did that, I was able to get away. I ran to the bedroom. I locked the door. I called 911. I'm screaming. I'm calling 911 and he fled."

(R. 243-44.) The next day, Williams obtained a protection-from-abuse order ("PFA order") because she "was terrified of the threats … now that the abuse had escalated from verbal … to physical." (R. 246.) However, approximately one week later, Williams filed a motion to dismiss the PFA order because, according to her, it was "no longer necessary." (C. 393.)

3

The Jefferson Circuit Court dismissed the PFA order on November 7, 2017.

On November 9, 2017, Essouiri and Williams had another text-message conversation, and those messages, according to Williams, included "the same kind of accusations and verbal abuse" that had been included in the October 26 text messages. (R. 252.) Around that same time, Williams "kicked [Essouiri] out" of the couple's apartment (R. 252), and shortly thereafter she had to contact the police because she returned to the apartment with her older son and found Essouiri there "very intoxicated." (R. 253.) According to Williams, Essouiri "was immediately in [her] face, belligerent," and she testified as follows regarding what occurred next:

"Q. Do you remember what [Essouiri] was saying?

"A. All of the same things. You know, 'you're a whore, you're a prostitute, you're a bitch.' It was always the same things. And so I continued on my way to the bedroom to get the things for the kids and got them as quickly as I could. [My older son] and I got to the door. We are trying to leave. He told me I couldn't leave. I remember he grabbed me, and I was facing him just on the opposite side of the door. He was on the inside of the door, and he started spitting in my face over and over. And then he started shoving me and shoving me backwards, backwards, and we're on the second floor and there's a very low railing, and he was trying to push me over the

4

railing. My [older] son started hitting him and screaming at him. And then I just started telling [my older son], 'Run, baby. Run to the car. Just run.' And he -- we ran as fast as we could to the car and got away."

(R. 253-54.)

Following that altercation, Williams "drove straight to the magistrate's office and pressed charges on the initial assault from October" and then drove her older son to school. (R. 255.) After taking her older son to school, Williams drove back past her apartment, and, according to Williams, Essouiri saw her drive by and "jumped in his car and started chasing her." (R. 255.) Williams testified that she "continued driving" but that she "ended up getting stopped because they were working on the road," at which point Essouiri "jumped out of his car and … started punching [Williams's] window over and over and over, trying to get in [her] car." (R. 256.)

On November 15, 2017, Williams obtained another PFA order, which prohibited Essouiri from having any contact with Williams, and that order was still in effect at the time of trial. Despite the PFA order, Williams remained in contact with Essouiri and eventually allowed him to return to her apartment because "he promised again he would stop drinking and everything would get better." (R. 259.) However, Williams

5

later "kicked [Essouiri] out again" (R. 260), and she told him in February 2018 that she wanted a divorce. On March 20, 2018, Williams obtained, in addition to the PFA order, "a no-contact order" that also prohibited Essouiri from contacting her. (R. 266.)

Following the issuance of the no-contact order, Williams began receiving telephone calls from an "unidentified caller." (R. 267.) Williams answered one of the initial calls, which had been placed by Essouiri, but she refused to talk to him. Williams continued to receive telephone calls from unfamiliar numbers "for a long time" (R. 274), at least one of which was from Essouiri, and she testified that she would sometimes receive as many as 50 calls in a single day.

Williams testified that, despite the PFA order and the no-contact order, Essouiri came to her apartment on June 4, 2018, and she testified as follows regarding what occurred at that time:

> "Q. And what happened when [Essouiri] … g[o]t to your apartment …?
>
> "A. … I had been at work and … had picked up [our son], who was now in daycare, headed home, got home, was carrying [our son]. I started to walk up the apartment stairs, and I heard tires squealing, and I looked and it was [Essouiri]. And he stopped the car in the middle of the drive and just jumped out and started chasing me.

6

"Q. What did you do when he started running?

"A. I ran. I ran as fast as I could. I was carrying a baby and a diaper bag. I had my keys and I had to unlock two locks. So I was trying to get in as fast as I could, fumbling with the locks, holding a baby. I had made it inside the door, and as I closed it, he kicked the door in. I fought with him to close the door, and he was able to gain entry into the apartment.

"....

"Q. What did he do when he got into the apartment?

"A. He was just like yelling and screaming and saying things. But I was screaming, so I don't know what he was saying.

"Q. At any point did he push you or shove you?

"A. Yes."

(R. 268-69.) Essouiri eventually fled when a neighbor heard Williams screaming and went to Williams's apartment to confront Essouiri.

Williams testified that her hand "had been slammed in the door when [she] was trying to prevent [Essouiri] from getting in" (R. 273), and the State presented the jury with photographs of Williams that had been taken shortly after the June 4, 2018, altercation. Those photographs show "a mark on [Williams's] neck and [her] chest" and "a mark on [her]

7

arm" (R. 271) and show that her hand was "swollen and red from being slammed in the door." (R. 274.)

On an unidentified date following the June 4, 2018, altercation, Williams found that "all four tires [on her car] had been slashed from the side." (R. 278.) Williams subsequently installed a camera on the exterior of her apartment, and, on June 27, 2018, that camera recorded a video of someone "slash[ing] [Williams's] tires again." (R. 279.) The State presented the jury with that video, and, according to Williams, Essouiri is the person who is slashing her tires in the video.

During the charging conference, the State argued that, "under [§ 13A-6-130] and [§ 13A-6-131], there are sentence enhancements that could apply that would require a special verdict form." (R. 369.) Specifically, the State argued that those statutes both provide that

> "the minimum term of imprisonment … shall be double without consideration of probation, parole, good time, credits, or any reduction in time if either of the following occurs: One, a defendant willfully violates a [PFA] order issued by a court of competent jurisdiction …; and, two, the offense was committed in the presence of a child under the age of 14 years at the time of the offense who is the victim's child or stepchild, the defendant's child or stepchild, or who is a child residing in or visiting the household of the victim or defendant."

8

(R. 370.) Thus, according to the State, if the jury convicted Essouiri of the charged offenses, the jury would then need to make special findings of fact as to whether those circumstances existed.

The trial court accepted the State's arguments, and, after instructing the jury on the elements of first-degree domestic violence, the court explained to the jury that, if it found Essouiri guilty of that offense, it must then determine whether the State had proven that he had committed the offense "while in the presence of a child." (R. 444.) With respect to the second-degree domestic-violence charge, the trial court likewise instructed the jury on the elements of the offense and then explained to the jury that, if it found Essouiri guilty of that offense, it must then determine whether the State had proven that he had committed the offense "in the presence of a child" and whether the State had proven that he "knew that he was violating the conditions of the [PFA] order." (R. 436.) The trial court also provided the jury with special-verdict forms that were consistent with its instructions. (Supp. C. 48-49, 110.)

The jury found Essouiri guilty of first-degree domestic violence (first-degree aggravated stalking) and second-degree domestic violence

9

(third-degree burglary). The jury also found that Essouiri had committed the first-degree domestic-violence offense in the presence of a child and that he had committed the second-degree domestic-violence offense in the presence of a child and in violation of a PFA order. (Supp. C. 48-49, 110.)

At the beginning of the sentencing hearing, the State informed the trial court that "it appears that the presence-of-a-child element was not in place at the time [Essouiri's offenses were] actually committed as opposed to actually being heard by the jury." (R. 486.) The State argued, though, that "the violation-of-a-[PFA]-order aggravator … was found. And what that does is it doubles the minimum sentence." (Id.) Thus, according to the State, because the jury found that Essouiri had violated a PFA order, the minimum sentence for his first-degree domestic-violence conviction, which is a Class A felony, was 20 years' imprisonment, and the minimum sentence for his second-degree domestic-violence conviction, which is a Class B felony, was 4 years' imprisonment. (R. 487.) Defense counsel did not dispute the State's argument regarding the minimum sentences and, in fact, stated that Essouiri "would have no problem with" the trial court imposing the minimum sentences (R. 491),

which are what the State requested, but counsel asked that the court consider splitting the sentences, which, as noted, the court agreed to do.

Discussion

I.

Essouiri first argues that "[t]he sufficiency and weight of the evidence do not establish that [he] committed" first-degree domestic violence (first-degree aggravated stalking) or second-degree domestic violence (third-degree burglary). (Essouiri's brief, p. 6.)

> "'"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998) (quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985)). '"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997) (quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992)). '"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998) (quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990)). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow

11

submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978)."

McGlocklin v. State, 910 So. 2d 154, 156 (Ala. Crim. App. 2005).

"A person commits the crime of domestic violence in the first degree if the person commits the crime of … aggravated stalking pursuant to Section 13A-6-91[, Ala. Code 1975,] … and the victim is a current or former spouse." § 13A-6-130(a)(1). Section 13A-6-91(a), Ala. Code 1975, states: "A person who violates the provisions of Section 13A-6-90(a)[, Ala. Code 1975,] and whose conduct in doing so also violates any court order or injunction is guilty of the crime of aggravated stalking in the first degree." Section 13A-6-90(a), Ala. Code 1975, states: "A person who intentionally and repeatedly harasses another person and who makes a threat, either express or implied, with the intent to place that person in reasonable fear of death or serious bodily harm is guilty of the crime of stalking in the first degree."

"A person commits the crime of domestic violence in the second degree if the person commits … the crime of burglary in the … third degree pursuant to Section[ ] … 13A-7-7[, Ala. Code 1975,] … and the victim is a current of former spouse." § 13A-6-131(a)(1). Section 13A-7-7(a)(1), Ala. Code 1975, states: "A person commits the crime of burglary

12

in the third degree if … [h]e or she knowingly enters or remains unlawfully in a dwelling with the intent to commit a crime therein."

In support of this claim, Essouiri makes the following argument:

"In this case, when viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could not have found [Essouiri] guilty beyond a reasonable doubt of these charges, and the trial judge could not have reasonably concluded that [Essouiri] committed these crimes. PFAs were withdrawn in this case and [Essouiri] was living in the home with [Williams's] permission. Further, [Williams] alleged that [Essouiri] was calling her from unknown or blocked numbers, but there is no way to prove that such calls were actually from [Essouiri]. She also claimed that [Essouiri] slashed the tires on her car. However, [Essouiri] is not identifiable from the video camera footage that was produced."

(Essouiri's brief, p. 8.)

In this case, it is undisputed that Essouiri and Williams were married at the time of the alleged offenses, which triggers the domestic-violence statutes. Thus, the dispositive questions for the jury were whether Essouiri committed first-degree aggravated stalking and third-degree burglary. That said, when considered in a light most favorable to the State, the evidence indicated that, during the time that two different court orders prohibited Essouiri from contacting Williams, he repeatedly telephoned her from numbers that were not familiar to her; that he went

13

to her apartment and forced his way into the apartment, causing her physical injuries; and that he slashed the tires on her car. Those facts were sufficient to prove that Essouiri, in violation of a court order, intentionally and repeatedly harassed Williams and that he either expressly or implicitly threatened her with the intent to place her in reasonable fear of death or serious bodily harm, which was sufficient to prove the offense of first-degree aggravated stalking. Those facts were also sufficient to prove that Essouiri unlawfully entered Williams's apartment with the intent to commit a crime therein (namely assault), which was sufficient to prove the offense of third-degree burglary. Thus, the State's evidence was sufficient to sustain Essouiri's convictions for first-degree domestic violence (first-degree aggravated stalking) and second-degree domestic violence (third-degree burglary).

The arguments that Essouiri has raised on appeal, quoted above, are applicable to his weight-of-the-evidence claim, not his sufficiency-of-the-evidence claim. However, Essouiri failed to preserve his weight-of-the-evidence claim for appellate review because he did not raise that claim in a motion for a new trial. Adams v. State, 336 So. 3d 673, 686 (Ala. Crim. App. 2020). Thus, we will not consider that claim.

II.

Essouiri next argues that the trial court erroneously instructed the jury with respect to the second-degree domestic-violence charge. Specifically, Essouiri argues that the version of § 13A-6-131 in effect at the time of his offense did not make it a consideration whether "the incident occurr[ed] in the presence of [a] child." (Essouiri's brief, p. 9.) Thus, according to Essouiri, by instructing the jury to consider whether he had committed that offense in the presence of a child, the trial court violated the ex post facto clause of the United States Constitution. See U.S. Const. Art. I, § 10. Essouiri also argues that the jury's finding that he had committed that offense in the presence of a child served to improperly "subject[ ] him to a higher sentencing range, due to doubling his sentence." (Essouiri's brief, pp. 13-14.)

However, Essouiri did not object to the trial court's jury instructions and did not object to his sentences, which we note are legal sentences.[1]

---

[1]Essouiri was sentenced to 20 years' imprisonment for his first-degree domestic-violence conviction, and first-degree domestic violence is a Class A felony, which carries a sentence of "life or not more than 99 years or less than 10 years." § 13A-5-6(a)(1), Ala. Code 1975. Essouiri was sentenced to 10 years' imprisonment for his second-degree domestic-violence conviction, and second-degree domestic violence is a Class B

In fact, Essouiri agreed with the State's sentencing recommendations and asked only that his sentences be split, which the trial court agreed to do. Thus, these arguments were not preserved for appellate review and therefore will not be considered. See Harrison v. State, 203 So. 3d 126, 134 (Ala. Crim. App. 2015) ("Because Harrison failed to object to the trial court's jury instructions, his arguments are not preserved for appellate review."); Crosslin v. State, 540 So. 2d 98, 98 (Ala. Crim. App. 1988) ("A violation of the ex post facto clause may not be raised for the first time on appeal."); and Hale v. State, 848 So. 2d 224, 233 (Ala. 2002) (holding that the defendant had waived his arguments regarding the application of sentencing enhancements by not raising the arguments at trial).

We acknowledge Essouiri's suggestion that we should review these arguments for plain error. However, this Court has repeatedly explained that plain-error review is not applicable in cases that do not involve the death penalty. See, e.g., Pendleton v. State, 208 So. 3d 45, 48 (Ala. Crim. App. 2015).

---

felony, which carries a sentence of "not more than 20 years or less than two years." § 13A-5-6(a)(2), Ala. Code 1975.

Conclusion

Essouiri has not provided this Court with any basis for reversing the trial court's judgment. Thus, the judgment is affirmed.

AFFIRMED.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur. McCool, J., concurs specially, with opinion.

McCOOL, Judge, concurring specially.

I authored the Court's opinion and fully concur in its analysis. I write specially because it is evident that the parties were confused regarding the sentencing aspects of § 13A-6-130, Ala. Code 1975, and § 13A-6-131, Ala. Code 1975, and I hope to clarify those aspects of the statutes for future reference.

Currently, § 13A-6-130 states, in relevant part:

"(b) Domestic violence in the first degree is a Class A felony, except that the defendant shall serve a <u>minimum term of imprisonment of one year</u> without consideration of probation, parole, good time credits, or any other reduction in time <u>for any second or subsequent conviction under this subsection</u>.

"(c) The minimum term of imprisonment <u>imposed under subsection (b)</u> shall be double without consideration of probation, parole, good time credits, or any reduction in time if either of the following occurs:

"(1) A defendant willfully violates a protection order issued by a court of competent jurisdiction and in the process of violating the order commits domestic violence in the first degree.

"(2) The offense was committed in the presence of a child under the age of 14 years at the time of the offense, who is the victim's child or step-child, the defendant's child or step-child, or who is a child residing in or visiting the household of the victim or defendant."

18

(Emphasis added.)

Similarly, § 13A-6-131 currently states, in relevant part:

"(b) Domestic violence in the second degree is a Class B felony, except the defendant shall serve a <u>minimum term of imprisonment of six months</u> without consideration of probation, parole, good time credits, or any reduction in time <u>for any second or subsequent conviction under this subsection</u>.

"(c) The minimum term of imprisonment <u>imposed under subsection (b)</u> shall be double without consideration of probation, parole, good time credits, or any reduction in time if either of the following applies:

"(1) A defendant willfully violates a protection order issued by a court of competent jurisdiction and in the process of violating the order commits domestic violence in the second degree.

"(2) The offense was committed in the presence of a child under the age of 14 years at the time of the offense, who is the victim's child or step-child, the defendant's child or step-child, or who is a child residing in or visiting the household of the victim or defendant."

(Emphasis added.)

At the sentencing hearing, the State argued that, because the jury found that Essouiri had committed his offenses in violation of a protection-from-abuse order, the minimum sentences that could be imposed for his convictions had to be doubled pursuant to § 13A-6-130(c)

19

and § 13A-6-131(c). Thus, according to the State, the minimum sentence for Essouiri's first-degree domestic-violence conviction was 20 years' imprisonment, given that a Class A felony normally carries a minimum sentence of 10 years' imprisonment. See § 13A-5-6(a)(1), Ala. Code 1975. Likewise, the State argued that the minimum sentence for Essouiri's second-degree domestic-violence conviction was four years' imprisonment, given that a Class B felony normally carries a minimum sentence of two years' imprisonment. See § 13A-5-6(a)(2), Ala. Code 1975. Essouiri agreed with the State's arguments regarding the minimum sentences and asked only that the trial court consider splitting his sentences, which the court agreed to do.

There are two problems with the parties' understanding of the sentencing aspects of § 13A-6-130 and § 13A-6-131. First, the parties believed that the "doubling" provisions of § 13A-6-130(c) and § 13A-6-131(c) mean that, when a defendant is convicted of those offenses, the minimum <u>sentences</u> found in § 13A-5-6 must be doubled. However, § 13A-6-130(c) and § 13A-6-131(c) expressly state that it is the minimum terms of imprisonment <u>found in subsection (b) of those statutes</u> that must be doubled in certain circumstances. Thus, because § 13A-6-130(b)

20

provides for a minimum term of imprisonment of 1 year, it means that, if § 13A-6-130(c) is applicable, then the minimum term of imprisonment, i.e., the minimum amount of time that the defendant must <u>serve</u> in prison, will be 2 years, but the minimum <u>sentence</u> that may be imposed for that Class A felony remains 10 years. Likewise, because § 13A-6-131(b) provides for a minimum term of imprisonment of 6 months, it means that, if § 13A-6-131(c) is applicable, then the minimum amount of time that the defendant must <u>serve</u> in prison will be 12 months, but the minimum <u>sentence</u> that may be imposed for that Class B felony remains 2 years.

That brings me to the second problem with the parties' understanding, which is that the minimum terms of imprisonment found in § 13A-6-130(b) and § 13A-6-131(b) were not applicable in this case. Both § 13A-6-130(b) and § 13A-6-131(b) expressly state that the minimum terms of imprisonment found therein apply only when the defendant has a previous conviction for violating those statutes. I find no indication in the record that Essouiri has any prior domestic-violence convictions; in fact, defense counsel stated at the sentencing hearing that Essouiri has no prior felony convictions of any kind, and the State did not

dispute that contention. Thus, there were no minimum terms of imprisonment that the trial court was required to impose in this case, much less double.

All that being said, this Court has correctly determined that, although the parties misinterpreted the sentencing aspects of § 13A-6-130 and § 13A-6-131, Essouiri's sentence are nevertheless legal because they fall within the sentencing ranges found in § 13A-5-6 and were properly split pursuant to § 15-18-8, Ala. Code 1975. Thus, I agree with the Court's conclusion that Essouiri is not entitled to relief from his sentences because the arguments he has raised on appeal were not preserved for appellate review.